AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**
U.S. District Court
District of Kansas

# UNITED STATES DISTRICT COURT

for the

District of Kansas

OCT 23 2015

Clerk, U.S. District Court
By _____ Deputy Clerk

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH USER IDS 277089512411378 AND 9208262
THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK AS
FURTHER DESCRIBED IN ATTACHMENT A.

)
)
)
)
)
)

Case No. 15-M-6258-01-KGG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 873 | Blackmail |
| 18 U.S.C. 875 | Interstate Communications |
| 18 U.S.C. 1030 | Fraud and Related Activity in Connections with computers |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan S. Ross, SA, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 23, 2015

City and state: Wichita, Kansas

_____
*Judge's signature*

Kenneth G. Gale, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH USER IDS 277089512411378 AND 9208262 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Ryan S. Ross, Special Agent of the Federal Bureau of Investigation, Wichita, Kansas, being duly sworn, state the following:

## AGENT INTRODUCTION

1.     I am a Special Agent of the Federal Bureau of Investigation (FBI), and currently assigned to the Kansas City Division, Wichita, Kansas Resident Agency. I have been employed by the FBI since January of 2015.  Prior to commencing service with the FBI, I was an attorney licensed to practice law in the State of Indiana, where I practiced for approximately eight years.  From January of 2015 to May of 2015, I attended the FBI Academy in Quantico, Virginia, where I received approximately 800 hours of instruction on a variety of law enforcement topics including criminal investigations, intelligence techniques, forensic science, interviewing witnesses and informants, physical and electronic surveillance (including court-ordered wire and electronic interceptions), undercover operations, search and arrest warrants, and telephone record analysis.

2.     As a Special Agent of the FBI, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §2510(7). I am authorized to investigate violations of laws of the United States, and have authority to execute arrest and search warrants under the authority of the United States.

3.     The statements contained in this affidavit are based, in part, on information provided by other law enforcement personnel and witnesses, information gained through my personal investigation, and on my experience and training as a Special Agent.  Since this affidavit is being submitted for the limited purpose of securing a search warrant for the email account(s) further described herein, I have not included each and every fact known to me concerning this investigation.  Instead, I have set forth only those facts that I believe are

necessary to establish the existence of probable cause to support the issuance of a search warrant for the identified email account.

## STATUTORY VIOLATIONS

4.   This affidavit is made in support of an application for a search warrant to search for and seize instrumentalities, fruits and evidence of violations of:

   a.   Title 18 U.S.C. § 873 (Blackmail);
   b.   Title 18 U.S.C. § 875 (Interstate Communications); and
   c.   Title 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers).

## ACCOUNT(S) TO BE SEIZED AND SEARCHED

5.   The items that are the subject of the search and seizure applied for in this affidavit are more specifically described in Attachments A and B.  I make this affidavit in support of an application for a search warrant for the Facebook accounts identified by User ID **277089512411378**      (www.facebook.com/GoViralWeb)      and      **9208262** (www.facebook.com/dcdorsett).

6.   The electronic communications service provider for these accounts is Facebook, a company headquartered at 1601 Willow Road, Menlo Park, CA 94025, and they maintain these accounts on their servers.

## STATUTORY AUTHORITY

7.   The government may use a search warrant to obtain subscriber information and records, including the contents of the subscriber's account(s).  18 U.S.C. § 2703(a), (b)(1)(A), (c)(1)(A).  Unlike traditional Federal Rule of Criminal Procedure (Rule 41) warrants, warrants issued pursuant to section 2703 may be used to compel records held in another district, so long as the warrant is issued by a court with jurisdiction over the criminal offense under investigation.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, this Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Also, pursuant to Title 18, United States Code, Section 2703(b)(1)(A), where such a warrant is obtained, no notice to the subscriber or customer is required to be given.

## BACKGROUND RELATING TO ELECTRONIC
## COMMUNICATIONS SERVICE PROVIDERS

9.   Because this investigation relates to the use of social networking accounts to facilitate the crimes being investigated, I am providing the following background information associated with accounts, which is based on my training and experience:

   a.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

   b.   Facebook is considered an electronic communications service provider (ECSP) because it provides its users access to electronic communications services as defined in 18 U.S.C. §2510(15).

   c.   Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   d.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

   e.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

   f.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a

"Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

g. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e. label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

h. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

i. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

j. Facebook Gifts is a feature that allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

k. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

l. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page.

m. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. He "Neoprint" for a given user can include the following information from the user's profile: friend lists; groups and networks of which the user is a member; "News Feed" information; "Wall" postings; "Notes"; status updates; links to videos, photographs, articles, and other items; event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

n. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

10.  Social networking providers, like Facebook, typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of services utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

11.  Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

12.  Generally, when served with a search warrant for electronic communications, the electronic communications service provider (ECSP), such as Facebook, will send the contents of the specified account(s) to the investigation agency, usually on a CD, DVD or via email, for the investigator to review.

13.  The ECSP can copy the contents of the account because that is within their expertise. Though the ECSP affirms that the records relate to the specified email account, the provider does not and will not undertake the examination of the contents of an account to make a determination as to what is relevant or irrelevant to the investigation.

14.  Generally, and in this case particularly, the ECSP is not familiar with the investigation and is not in a position to identify the victim(s) or subject(s) of the investigation. The ECSP is neither qualified nor trained to search the account information as would a law enforcement officer. Only a trained agent, familiar with the statutory violations and facts of the case, can determine what items should be or should not be seized. For these reasons, your Affiant requests the provider disclose the records listed in Section 1 of Attachment B, for the account(s) listed in Attachment A.

15.  Generally, the ECSP copies the contents of the account as the ECSP finds it at the time of service of the search warrant (unless a preservation letter was sent earlier). In this regard, the information provided to law enforcement is only the information currently stored or maintained in the account – **it may not, and likely is not, the entire account containing**

**every message or post since the account's creation**. In this regard, a request for a "date range" of content would be conceptually inaccurate.

16.     Information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with a Facebook account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, instant messages, friends lists, and images posted (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

17.     Further, information maintained by the ECSP can show how and when the account was accessed or used. For example, as described below, providers typically log the Internet Protocol (IP) addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.

18.     Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video). Stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information in the account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

19.     Finally, because the account itself is being used to facilitate the crimes described herein, I believe that the account as it is currently found may be seized for examination as an instrumentality of the crime, similar to a computer.

## BACKGROUND INFORMATION RELATED TO INVESTIGATION

20.     Beards Floral Design LLC is a floral design studio located at 5424 East Central Avenue, Wichita, Kansas 67208. It was formerly located at 926 West 2nd Street, Wichita, Kansas 67203. Beards Floral Design LLC is owned by Matthew Dover.

21.     "Ripoff Report" (www.ripoffreport.com) is a self-described consumer advocate website that allows members of the public to view and post "complaints, reviews, scams, lawsuits and frauds." The policy of "Ripoff Report" is that all complaints are permanent. Complaints are not removed from the website upon request, nor does the website allow users to remove their own reports. Even if a report is resolved to the author's satisfaction, the original complaint remains on the "Ripoff Report" website.

22. "Leagle" (www.leagle.com) describes itself as "a leading provider of copies of primary caselaw from all Federal courts and all State higher courts." The information contained on its website is made available to its users for legal research. According to Donald Johnson, an employee of "Leagle," users are encouraged to email comments to "Leagle" regarding the decisions posted on its website.

23. "The Dirty" (www.TheDirty.com) is a "reality Internet" website that allows its users to post pictures and comments about the local club and social scenes in the cities in which they live. Although "The Dirty" does not have a no-removal policy related to the postings that are made by its users, its website states that it will only remove a posting pursuant to a valid court order (a few limited exceptions were also noted on the website).

24. Bradley A. Pistotnik is an attorney and the president of Brad Pistotnik Law, P.A. He was a former part-owner of Affiliated Attorneys of Pistotnik Law Offices, P.A., which was dissolved by court order on January 15, 2015.

25. Viral, LLC, is a business organized by David Dorsett in the State of Kansas on March 4, 2015.  I t is believed that Viral, LLC, is operated by Dorsett and his spouse from their residence, 6203 East Oxford Street, Wichita, Kansas 67220.  The East Oxford Street address is identified as the mailing address on the Articles of Organization filed for Viral, LLC on March 4, 2015.  Additionally, postings on the Viral, LLC Facebook page reveal a photo (appearing to be inside a residence) labeled "headquarters."  Lastly, Dorsett informed SA Ensz, on September 9, 2015, that he worked out of his residence.

26. Divinity LLC was organized by Terry Pilgreen on January 15, 2015, on behalf of its owners, Bradley A. Pistotnik and David Dorsett.

27. "GoDaddy" (www.godaddy.com) is an Arizona company that provides Internet domain registry and web hosting services.

28. Gmail is a web-based email service owned by Google Inc., headquartered in California.

29. Facebook is a web-based social networking and messaging service owned by Facebook, Inc., headquartered in California.

## PROBABLE CAUSE

30. This investigation began in March 2015 with a report to the FBI by a representative of Ripoff Report.  More specifically, on March 4, 2015, Adam S. Kunz, an attorney at Jaburg & Wilk, P.C., contacted the Phoenix Division of the FBI to report electronic mail (email) threats received by his client, Xcentric Ventures LLC, P.O. Box 470, Phoenix, Arizona 85280, doing business as "Ripoff Report."

31. Investigation into the source of the threats lead to the discovery of additional instances of associated "distributed denial of service" attacks, or DDoS attacks, going back to 2013.

A DDoS attack is a method of attacking a computer system by flooding it with so many messages that it is obliged to shut down.

32.   For purposes of chronology, this affidavit will begin with the earliest identified DDoS or similarly-styled attacks.

**Early Facebook Posts**

33.   The following information was found via search of public posts on the Facebook profile of Viral LLC (www.facebook.com/GoViralWeb, user ID# **277089512411378**).

    a.   On October 25, 2012, the following message was posted to the Viral, LLC Facebook page: "We've made something truly awesome/terrible for Halloween. Please have fun and use wisely."

    b.   Below that post was an additional text box which read: "GoViral Web Development – The Universal Mobile Exploder[,] Enter any 10-digit mobile phone number, a message, and select # of times to send. This program will send texts from the recipient's number so it appears to…"

    c.   On March 20, 2013, the following message was posted to the Viral, LLC Facebook page: "The universal multimedia messenger is working again. Text, MMS, Facebook Message, Email from anyone to anyone as many times as you want. http://universalmessage.me Password: ivymike".

34.   These posts were publically available as of October 5, 2015.

35.   The following posts were recovered from a loose media storage device obtained from the Wichita Police Department. The storage device was previously provide to the Police Department during the investigation of a complaint alleged by Matthew Dover of Beard's Floral Design LLC. The posts were on the Facebook profile of David Dorsett (www.facebook.com/dcdorsett, user ID# **9208262**).

    a.   On March 26, 2013, the following message was posted to David Dorsett's Facebook page: "UniversalMessage.me and the Ultimate Text Bomber have gone viral. The ability to anonymously destroy and smartphone is much too powerful for the general public to have access too. We are accepting 1000 members who will get unlimited access…"

    b.   On March 29, 2013, the following message was posted to David Dorsett's Facebook page: "Someone called me a renegade digital mercenary for charging $20 for access to the text bomb and it got to me. I don't want "blood money" for a web style revenge tool… but I also can't back out on the vengeful people who paid. So here's what I'm going to do: http://universalmessage.me is now free for all. Go nuts."

**The Dirty**

36. During the course of this investigation, several interviews have been conducted. One interviewee, who wished his or her identity remain unknown, provided the following information:

    a. On February 10, 2013, a person affiliated with "Internet Reputation" (www. internetreputation.com) sent David Dorsett an email message at **dave.dorsett@gmail.com**, inquiring: "Would you be able to remove other clients posts we have from TheDirty.com for $1000.00 per client? We have many inquires about removing people from this site and would likely be able to contract 2 to 5 of these projects a month to you."

    b. On February 11, 2013, Dorsett replied to the aforementioned email stating that he would be interested in discussing the offer later that evening.

37. On March 20, 2013, the following message was also posted to the Facebook page of Viral, LLC (www.facebook.com/GoViralWeb): "GoViral is now offering REMOVAL from THEDIRTY.COM for $1000 a page. Contact us to inquire."

38. On September 22, 2015, David Gingras, an attorney who represents both Ripoff Report and The Dirty, provided the FBI with threatening email messages that were sent to The Dirty in 2013.

39. One of the email messages provided by Gingras was sent to The Dirty on November 7, 2013. It appeared to have been sent from email address "nik@thedirty.com" to "PR@thedirty.com" and its subject line read: "NOW FLOODING ALL YOUR ADVERTISERS UNTIL THEY PULL THEIR ADS OR YOU REMOVE PAGE – http://thedirty.com/2013/10/mike-grbic-big-ego-big-gimmick/ - ONCE THIS LINK GOES 404, FLOODING STOPS AUTOMATICALLY." The message line of the email message read: "The asshole hired help from me…ANONxMESSIAH. we love your site but have been hired to cost you traffic until: REMOVE ONE PAGE - http://thedirty.com/ 2013/10/mike-grbic-big-ego-big-gimmick/ - OR WE DDOS THEDIRTY.com – ONCE THIS PAGE IS REMOVED THE DIRTY.com WILL BE LEFT ALONE – ONCE THIS LINK GOES 404, FLOODING STOPS AUTOMATICALLY." As a result of the email messages, "The Dirty" was forced to remove content from its website.

40. During a search of David Dorsett's residence on October 7, 2015, FBI agents seized a loose hard drive (further identified in paragraph 71 below). This hard drive contained a copy of the emails referenced in paragraphs 35a and 35b above, along with a continuation email, sent on February 12, 2013, stating: "Let me level with you. The way I'm doing this is based on a javascript loophole I found in their site. I'm basically bullying them into taking down targeted pages. They can either decide to let it affect their site's overall traffic and performance by complying with my requests, or they can decide to fix the loophole. I would guess this will work for about 5-10 clients before they close the

loophole, if you know what I mean. Pretty much they'd just have to add capcha to their comments box. I think it'd be best for both of us if you look at the clients you have wanting to get removed, take the 5 highest paying, and then force that set of 5 offline.. and split it."

## Beard's Floral Design

41.     On May 1, 2013, the email address of Beards Floral Design LLC (info@beardsfloral.com) began receiving a relentless stream of email messages that appeared to come from its own email address. The subject line of at least some of the messages read: "||| cryptokid |||" and the body read: "????? ???????? ????? ???????????? ? pay form on root/order/". The voluminous email messages rendered the Beards Floral Design LLC email address unusable and caused its website to crash. This occurred less than two weeks prior to Mother's Day. Matthew Dover reported the email messages to the Wichita Police Department. Your affiant has reviewed the police report and accompanied SA Thomas S. Ensz to interview Dover on September 25, 2015.

42.     With the assistance of the men who helped design his website, Landon Taylor and Ryan Hendrix, Dover was able to determine that David Dorsett was likely behind the email messages. The men suspected that Dorsett was behind the messages after reviewing a rejection notice that was sent to the Beards Floral Design LLC email address. This notice was automatically generated by the mail delivery software used by Beards Floral Design LLC. It stated that an email message sent from the Beards Floral Design LLC email address couldn't be delivered to **"dave.dorsett@gmail.com"** because it was receiving mail at a rate that prevented additional messages from being delivered.

43.     Based upon his suspicion, Dover contacted Dorsett via telephone. Although Dorsett denied being behind the multiple, repeating email messages being sent to the Beards Floral Design LLC email address, he was able to make the messages stop while speaking to Dover. Dorsett later admitted to Dover that he was behind the email messages and apologized.

44.     Dover estimated that the loss suffered by Beards Floral Design LLC exceeded $5,000.00 based upon the potential revenue lost from the crashing of its website in the days leading up to Mother's Day, as well as in the amount of time it took Taylor and Hendrix to restore the website.

## Ripoff Report

45.     As related to Ripoff Report, the threats began on September 25, 2014, at approximately 9:13 a.m. (local Phoenix time). The text of the email threat read: "Remove this page and we stop - [the URL of the identified report] - if you dont remove it we will begin targeting your advertisers and explain that this will stop happening to them once they pull their ads from ripoffreport.com or ripoffreport.com kills this page - [the URL of the identified report]. You have 4 hours before we start hitting your advertisers." Ripoff Report and its attorneys received these threats every few seconds in a relentless stream of emails at multiple email addresses.

46.   Ripoff Report attempted to determine the source of the email threats, but was unable to do so (the "from" line of the email messages contained various email addresses, including at least one Ripoff Report email address). Eventually, the email messages overwhelmed the email accounts, and Ripoff Report removed the identified page from its website.

47.   The text of the identified page stated: "If you get into an accident in Wichita beware of the following: Brad Pistotnik is a lawyer who was working with his brother for all these years and I found out this way. He has been arrested numerous times and even did jail time. Just google Brad Pistotnik arrests and you can see for yourself. This guy is a lawyer? He is a drunk and a criminal and you are better off hiring his brother at Pistotnik Law. He needed his brother until he could get his license straight again."

48.   In or around May, 2015, Ripoff Report again posted the identified page to its website.

49.   On July 2, 2015, at approximately 5:43 p.m. (local Phoenix time), Ripoff Report received additional email threats similar to the ones received on September 25, 2014. The text of these threats read: "RE-Remove this page and we stop - [the URL of the identified report] – if you dont remove it we will begin targeting your advertisers and explain that this will stop happening to them once they pull their ads from ripoffreport.com or ripoffreport.com kills this page - [the URL of the identified report]. You have 4 hours before we start hitting your advertisers."

50.   In response to the overwhelming number of email messages received by Ripoff Report and its attorneys, the identified report was again removed from the Ripoff Report website.

51.   Analysis of the email messages sent to Ripoff Report on July 2, 2015, revealed that they originated from servers at GoDaddy.

**Leagle, Inc.**

52.   On the morning of September 25, 2014, Donald Johnson, an employee at Leagle.com, began receiving a flood of threatening email messages which read: "Remove this page and we stop - [the URL of the identified page] - if you dont remove it we will begin targeting your advertisers and explain that this will stop happening to them once they pull their ads from leagle.com or leagle.com kills this page - [the URL of the identified page]. You have 4 hours before we start hitting your advertisers." Johnson estimated that he received approximately 4,000 such email messages.

53.   The identified page made available a 1993 Supreme Court of Kansas opinion (254 Kan. 294 (1993)) by which Bradley A. Pistotnik was suspended from practicing law for one year.

54.   On September 25, 2014, at approximately 1:17 p.m., Johnson received an email message which appeared to have been sent from email address "admin@lawyer.com." The text of

the email stated: "Hello, my name is Sanjeev I am the webmaster for lawyer.com and our entire organization from the board of directors to the copy editors are getting huge volumes of spam that says to make it stop we either remove our ads from leagle.com or you guys delete this page http://www.leagle.com/decision/1993548254Kan294_1522.xml /IN%20RE%20PISTOTNIK on your end. The president has been calling me directly saying he's getting thousands of emails. Our spam filters cant seem to stop them. If you can't remove the page the hackers are wanting removed, please remove all ads for lawyer.com from leagle.com immediatley. Our organization cannot sustain this level of spam. Your IMMEDIATE action is appreciated, Sanjeev R. Web Developer Lawyer .com".   Johnson contacted "Lawyer.com" and determined that the company hadn't received any email messages similar to those he had received.  He was also advised that the email from "Sanjeev R." didn't originate from "Lawyer.com."

55.    Leagle.com was forced to remove the opinion regarding Pistotnik in order to stop the email messages.

56.    Analysis of the email messages sent to Leagle.com on September 25, 2014, revealed that they originated from servers at GoDaddy.

**Dorsett's Attempt to Blackmail Brad Pistotnik**

57.    On September 8, 2015, Bradley A. Pistotnik, Attorney, Brad Pistotnik Law P.A. (Brad Pistotnik Law), contacted the Wichita Resident Agency of the FBI to report threatening and extortionate email and text messages he was receiving from David Dorsett. Dorsett is the owner of Viral, LLC, and a partner with Pistotnik in Divinity, LLC. Pistotnik also formerly employed Dorsett's business to work on the website of Brad Pistotnik Law.

58.    On or about September 5, 2015, while in Mexico, Pistotnik sent a text message to 316-210-8100, a number at which he had previously communicated with Dorsett, asking him to review and correct errors on the Brad Pistotnik Law website. Pistotnik received a reply to the message which accused him of wasting his (Dorsett's) time.

59.    On or about September 7, 2015, at 1:26 p.m., Pistotnik received an email message from **"dave.dorsett@gmail.com"**, an email address at which he had previously communicated with Dorsett, which stated: "…the potential liability on you of me deciding to come clean to the authorities about the time you commissioned me to intimidate a minor who dumped your daughter or pull any intimidation hacks to get web pages removed from websites protected by the first ammendment is more than the worst-case of my own liability." Later in the message, it stated: "Please 'rethink' how much my services have really been worth to you and get back to me by tomorrow with a figure you think would be more appropriate given how much I've actually done for you.  Stop devaluing me.  I left every job because the relationship became usury.  All I ask is an equal value % for the amount I've helped your bottom line." It then stated: "Of course you can say you don't owe me anything and choose not to do anything but the overall progress and synergy between us will suffer.  For months I've been your equal helping you accomplish your

goals.  You did, and were all happy when you settled.  And you rewarded the guy who made the difference $0." The email was signed: "David."

60.   On or about September 8, 2015, at 1:51 p.m., Pistotnik received several text messages from 316-210-8100, one of which stated: "Pistotnikgate begins today unless I hear from you." In reply, Pistotnik sent a text message stating that he was going to report Dorsett's threats to the police. Pistotnik thereafter received numerous text messages from 316-210-8100. One of the text messages stated: "I can serve the time! Can you?" Another stated: "Sorry, brad either settle or I blow the whistle. I am not afraid of your threats." Yet another stated: "Bring it I've been waiting for this moment since I met you brad. You are about to get played hard. 450k and I will sign a non disclosure and say nothing. That is my final offer."

61.   On or about September 8, 2015, at 3:55 p.m., Pistotnik received a text message from 316-210-8100, which stated: "One hour left hot shot."

62.   On or about September 8, 2015, at approximately 3:00 p.m. (local Phoenix time), Kunz and Maria Speth, another attorney from Jaburg & Wilk, P.C., contacted SA Paul Schaaf of the Phoenix Division of the FBI. Kunz and Speth advised SA Schaaf that they had received a voice message from Dorsett, who left a call back number of 316-210-8100. When Speth spoke to Dorsett, he told her that Pistotnik had hired him to build a messaging system by which he could securely transmit messages to his clients. He also said that Pistotnik requested the messaging system be built as a web form that would use cloud methodology and that Pistotnik knew it would be nearly impossible to determine the Internet Protocol (IP) address of the sender. Dorsett claimed that Pistotnik paid him $10,000.00 to build the system and that he later misused the system to intimidate "Ripoff Report" and the ex-boyfriend of Pistotnik's daughter. Dorsett said that he deleted the system from Pistotnik's server once he found out what it had been used for. He also claimed that he had copied evidence of the system's misuse. Dorsett then directed Speth to www.kcpromos.com to view the web page messaging system that he built for Pistotnik. Kunz and Speth provided SA Schaaf with notes of Speth's conversation with Dorsett, as well as a copy of the web page they found at www.kcpromos.com. Analysis of URL "kcpromos.com" revealed that it was hosted on a GoDaddy server (the same provider as associated with the attacks on Leagle.com and Ripoff Report).

63.   Your affiant has viewed the copy of the web page and observed that it allowed the user to enter information for both the sender and recipient of the messages, as well as the number of messages to send. The web page also had a picture of Shiva, a Hindu deity, and the words "SHIVA | THE DESTROYER" at the top of the page.

64.   On or about September 8, 2015, at 5:01 p.m., while speaking to your affiant and Special Agent Thomas S. Ensz of the FBI, Pistotnik received a text message from 316-210-8100, which stated: "I will gladly hear any offers to settle and truce but am beginning to right these wrongs now. Let me know." In reply, Pistotnik sent a text message that stated: "I will call later." Pistotnik then received a text message from 316-210-8100, which stated: "Have already spoken with Maria Speth and your brother and have offers from both."

65.  On September 9, 2015, Terry Pilgreen mailed a letter to Dorsett, at 6203 East Oxford Street, Wichita, Kansas, announcing the proposed dissolution of Divinity LLC. The letter included a notice of a special meeting to be held on September 16, 2015. The letter was returned to Pilgreen with a notification that Dorsett had moved from the residence. Despite this notification, subsequent physical surveillance conducted at this East Oxford Street address on September 18th, 29th, and 30th (2015) places vehicles owned or driven by Dorsett still at the residence.

66.  On or about September 9, 2015, at 10:57 a.m., Special Agent Ensz left a voice message for Dorsett at 316-210-8100. At 3:55 p.m., Dorsett called Special Agent Ensz from 316-210-8100. Dorsett told Special Agent Ensz that he was contacting the FBI on behalf of Speth. Dorsett initially agreed to come to the FBI office to speak to Special Agent Ensz, but called back at 4:29 p.m. to cancel. During his conversation with Special Agent Ensz, Dorsett claimed that the only recent contact he had with Pistotnik was to inform Pistotnik that he and his wife were out of town. Prior to the conclusion of the call, Dorsett said that he would further consider whether or not he would be willing to come to the FBI office to speak with Special Agent Ensz and agreed to contact him on September 11, 2015.

67.  On or about September 9, 2015, at 8:01 p.m., Dorsett sent an email message from **"dave.dorsett@gmail.com"** to Pistotnik, his spouse, and Pilgreen, in which he stated: "I was recently approached by a task force including FBI Cyber Crimes Agent Thomas Entz and John Schaff and attorney Maria Speth. The task force is currently pursuing active federal criminal and civil cases against Brad Pistotnik." Dorsett also stated in the email: "It has been made clear to us that without our expert testimony there is not enough evidence to continue either case." Dorsett concluded the email with a list of demands, one of which stated: "What we seek is a settlement of $425,000.00. For that we will sign a non-disclosure agreement and assure you that none of our business conversations, nor personal conversations, nor proprietary technology nor anything will ever be discussed with anyone.  This ensures that no strategy or proprietary technology we used to help Brad Pistotnik Law will ever be able to be used again.  Nor would any of the methods or strategies we used to create such technology be conveyed ever again."

68.  On or about September 10, 2015, at 9:05 a.m., a message was sent to the bradpistotniklaw.com website which stated: "Please respond to terry letter asap.. if shiva dies forever u are OK if not they have you bad. I have said nothing ready to delete if u agree have no choice but to sell to r.o.r. for same price which proves it. Help me help u be ok. They waited til u in mex to come to me. Had to publicly disassociate or I'd be in trouble too." The message was sent from IP address 172.56.15.4, which is registered to T-Mobile (according to queries conducted through all-nettool.com and centralops.net), the provider of service for Dorsett's cellular telephone.

69.  On or about September 10, 2015, at 9:32 a.m., Dorsett forwarded two prior email messages from **"dave.dorsett@gmail.com"** to Pistotnik's email address. One of the email messages was originally sent from Pistotnik to Dorsett on or about September 20, 2014, at 1:14 p.m. In the message, Pistotnik told Dorsett: "Dave look at this new page

from yesterday and tell me how we get rid of it states created yesterday." A link to a URL was listed below Pistotnik's statement to Dorsett. This URL in the link matched the URL listed in the multiple, repeating email messages sent to Ripoff Report on September 25, 2014, and July 2, 2015.

70.     The other prior email message forwarded to Pistotnik was originally sent from Dorsett to Pistotnik on or about September 25, 2014, at 1:20 p.m. In the message, Dorsett told Pistotnik: "Check out this article:  Your page is probably the first they have been forced to take down." Beneath Dorsett's comment was a link to a URL of an Internet article entitled, "Ripoff Report to Revise Removal Policy: May Accept Court Orders." The first sentence of the article stated: "Ripoff Report is notorious for its "no removal" policy, and claims enthusiastically that it doesn't remove reports. No amount of money, pleading or legal litigation seems to be capable of changing this policy."

71.     On or about September 10, 2015, at 4:26 p.m., Pistotnik sent Dorsett a text message at 316-210-8100 which read: "Dave, we are parted. Please leave me and my family alone and stop texting me." Dorsett replied to this message with a text message that read: "Sorry to have bothered you Brad. I did everything I could to help you. I will certainly leave you and Christina and your daughter alone. You had one friend left in the world brad, and you took me for granted."

72.     On or about September 11, 2015, at 12:20 p.m., Dorsett called Special Agent Ensz from 316-210-8100 and said that he was unwilling to come to the FBI office to speak to him. During the ensuing conversation, Dorsett attempted to explain the technology behind the messaging tool he had created. Special Agent Ensz thereafter requested that Dorsett send him an email describing the technology. Dorsett agreed to do so.

73.     On or about September 11, 2015, at 6:27 p.m., Dorsett sent Pistotnik an email which read: "I met again with FBI Agent Tom Ensz and although they are putting me under a ton of pressure, I again declined to cooperate. All they are looking for is this invoice from an email you got from me on 09/29/14. Truck Accident Lawyer Group dated me a check for $2050 the same day Before divinity llc was anything. I again refused to provide this. I understand youve declined the divinity deal which is a totally other issue about that business. But I am upset that you can't help me help you. There is room in this situation for it to work out still. You may always text me if you change your mind. This whole thing is no big deal. But it can be no big deal to anyone."

74.     On or about September 12, 2015, at 12:00 p.m., Dorsett sent Special Agent Ensz an email message, from **"dave.dorsett@gmail.com"**, with an attachment named: "Tom Ensz Follow Up.docx". In the document, Dorsett claimed that he created the original "loop logic" for a local bail bondsman who wanted to "blow up" the cellular telephones of clients who had absconded from court under his bonds. Dorsett also claimed that he consulted with an unnamed attorney regarding whether or not this violated the Can-Spam Act and that he was assured it didn't. In the document, Dorsett also stated that he maintains a "blind copy address that stores a copy of just the text and recipient of what was sent" in order to know what is sent through any of his web forms.

75.    Dorsett also provided a listing of three server accounts (SHIVA, GANESH, and VISHNU) that were hosted by "GoDaddy" in the aforementioned document. Dorsett identified the servers as his and stated that he used "SHIVA" as his test server.

## October 7, 2015 Search Warrant and Interview

76.    On October 7, 2015, Dorsett was interviewed by the FBI during the execution of a search warrant at his residence.

77.    Dorsett admitted to causing the aforementioned email message to be sent to The Dirty. He also claimed that Mike Grbic, a local real estate agent, paid him $2,500.00 as "a gratuity" for getting the referenced URL removed from thedirty.com. Dorsett denied causing any of the other email messages provided by Gingras to be sent to The Dirty.

78.    During the search of Dorsett's residence, a 320GB HGST hard drive, serial number 130810TF645AY1H4LY8L, was recovered. During a preliminary review of the drive utilizing forensic computer equipment, a file named "z5.asp" was located in a folder named "shiva" in a web backup of "goviralweb.co." When the file was opened using the Notepad program, it revealed the source code by which Dorsett caused the aforementioned email message to be sent to The Dirty.

79.    The source code further revealed that the same email message was sent twenty-five times each to multiple email addresses at The Dirty from other email addresses at The Dirty, as well as from outside email addresses, such as "events@bellagio.com" and "THEDIRTY.COM @domainsbyproxy.com."

80.    Also found in the "shiva" folder was a file named "default.asp." When this file was opened as an .html file in Internet Explorer, its form-fields appeared very similar to those seen on the copy of the web page found on www.kcpromos.com (previously provided to the FBI by Speth). The folder also contained an image file named "shiva.png" which was identical to the image seen on the copy of the web page provided by Speth. When "default.asp" was opened using the Notepad program, a reference to "shiva.png" was noted. Also noted was code that would cause a blind-copy email message to be sent to email address **viralshiva@gmail.com**, if no other email address was specified in the "bcc" or blind-carbon-copy form-field.

81.    Based upon these observations, I believe that "default.asp" is the same tool, or a very similar tool, cited by Dorsett as being used to send the threatening email messages to Ripoff Report.

82.    Preservation requests have been submitted to Facebook for both user IDs, **#277089512411378** (www.facebook.com/GoViralWeb) and **#9208262** (www.facebook.com/dcdorsett).

## CONCLUSION

83.   Based upon the aforementioned facts, I have probable cause to believe and do believe the following:

a.   David Dorsett has committed violations of Title 18 U.S.C. § 873, Blackmail; Title 18 U.S.C. § 875, Interstate Communications; and Title 18 U.S.C. § 1030, Fraud and Related Activity in Connection with Computers.

b.   David Dorsett utilized Facebook accounts identified by user IDs **#277089512411378** (www.facebook.com/GoViralWeb) and **#9208262** (www.facebook.com/dcdorsett) to facilitate the commission of these violations.

c.   Evidence of the commission of these violations is located within the Facebook accounts, identified herein and listed in Attachment A to this affidavit, and the evidence, listed in Attachment B to this affidavit, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

_____

Ryan S. Ross
Special Agent
Federal Bureau of Investigation

Sworn to before me this 23d day of October, 2015.

_____

HONORABLE KENNETH G. GALE
United States Magistrate Judge
District of Kansas

## ATTACHMENT A

### (Property/Premises to be Searched)

This warrant applies to information associated with Facebook user IDs:

"**277089512411378**" (www.facebook.com/GoViralWeb)
"**9208262**" (www.facebook.com/dcdorsett)

that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered at 1601 Willow Road, Menlo Park, CA  94025.

**ATTACHMENT B**
**(Property to be Seized)**

1. **Information to be disclosed by Facebook**

   To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Facebook is required to disclose the following information to the government for each account, user ID, or identifier listed in Attachment A:

   a. The contents of all available messages sent, received, or deleted by the user(s), as well as all messages in storage under, and associated with, any preservation numbers associated with the account(s), and all headers and originating IP addresses, from October 1, 2012 through and including the present date (including, but not limited to, e-mails, postings, chats, unsent messages, photographs, videos, recordings, images, or communications of any kind);

   b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, log-in credentials, profile for the user(s), records of session times and durations, the date on which the account was created, the length of service, the types of all account services utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

   c. All Neoprints, including "News Feed" information; "Wall" postings; "Notes"; status updates; comments; and information about the user's access and use of Facebook applications;

   d. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

   e. All records pertaining to communications between Facebook and any person regarding the account, including contacts with support services and records of actions taken.

2. **Information to be seized by the government**

   All information described above in Section 1 that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. § 873, Blackmail; Title 18 U.S.C. § 875, Interstate Communications; and Title 18 U.S.C. § 1030, Fraud and Related Activity in Connection with Computers, including:

a.  Data and content tending to show the user of the account, including but not limited to subscriber information, IP logs, address books, friend-lists or buddy-lists, headers, salutations, and message content referencing the user or other identifier information such as credit card numbers, receipts, phone numbers, physical addresses, or photographs;

b.  Data and content to, from, or about the following entities or individuals: Ripoffreport.com, Leagle.com, Godaddy.com, Beards Floral, The Dirty, Pistotnik Law, Brad Pistotnik, Christina Pistotnik, Terry Pilgreen, and KCPromos.com.

c.  Data and content relating to the creation, operation, research, development or deployment of distributed denial of service attacks or similarly targeted "flooding" attacks;

d.  Data and content relating to anonymization techniques, software, executable programs or code; and

e.  Data and content tending to show or relate to extortionate threats or demands for money or other things of value.